+

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT LOREN BOND,

          Petitioner,                    No. CIV S-99-2150 LKK CHS P

     vs.

RICHARD A. RIMMER,

          Respondent.          <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

**I.    <u>INTRODUCTION</u>**

          Petitioner, Robert Loren Bond, represented by counsel, is proceeding upon his second amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, attacking his conviction entered on January 20, 1995, for conspiracy to commit first degree murder, in violation of Cal Penal Code §§182, subd.(a)(1), 187.  Bond was tried by jury in Case No. C35712, in Solano County Superior Court, acquitted of multiple related charges, with the jury hung as to several charges, convicted of the conspiracy, and sentenced on January 23, 1995, to a term of 25 years to life in prison.

/////

/////

1

## II.   CLAIMS

Bond's second amended petition raises four claims as follow, verbatim:

A.   Bond's due process rights under the Fifth and Fourteenth Amendments were violated when the conspiracy conviction was based on overt acts that, as a matter of law, were not separate from the charged conspiracy agreement.

B.   Bond was deprived of his right to due process and his Sixth Amendment right to jury trial when the trial court failed to instruct the jury explicitly on a crucial element of conspiracy to commit murder.

C.   Bond's right to due process secured by the Fifth and Fourteenth Amendments [were violated] when there was insufficient evidence to support an actual agreement to kill and the intent the victim be killed.

D.   Accumulation of error rendered Bond's conviction fundamentally unfair and a violation of his right to due process under the Fifth and Fourteenth Amendments to the Constitution.

/////

Upon careful consideration of the record and the applicable law, the undersigned will recommend this petition for habeas corpus relief be denied.

## III.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Facts

Bond was tried jointly with Bernard Lee MacCarlie and Leafe Dodds, in the second of three trials involving nine individuals entangled in a ghastly parody of rural neighborliness in a sparsely populated area.  Nine individuals were charged in the bludgeoning and hacking death of Gary "Hop" Summar, who had lived among them.

The events resulting in the murder occurred during late September and early October of 1991.  One would surmise that the tale would be short, but its telling consumed thirteen pages of the opinion of the California Court of Appeal for the First Appellate District in the consolidated appeals from two of the three trials, including Bond's.  In this habeas corpus proceeding, Bond's counsel expended some six pages in a shortened version, omitting the more sordid details of the lives of the folks of Hawkins Bar.  The respondent state, having none of that, related the entire story in forty nine

pages of sad particulars.  This Report will summarize the essential information necessary to understand the facts, then present the claims, the facts actually heard by Bond's jury, followed by the applicable law and recommended resolution.

By "essential information necessary to understand the facts," is meant general information not otherwise collected in one place in the voluminous files of the five related cases pending in this Court, which does not appear to be contested by the parties, and will inform the testimony presented by inarticulate witnesses heard by Bond's jury.

### 1)   The Place

The circumstances surrounding the death of Hop Summar took place in and around tiny Hawkins Bar.  The events related by the witnesses are extremely difficult to follow without an understanding of the area.  Indeed, both juries involved in the Bond/MacCarlie/Dodds trial (his own and that of MacCarlie and Dodds) were taken to Hawkins Bar to view the scene.

Bond's counsel, in this petition, describes the place as a:

> ...tiny "blinkum" of a spot on State Highway 299 in rural Trinity County. Blink and you've come and gone, missing the BP gas station, Simon Legree's Bar, a deli store and the few cabins and trailers which comprise the Community.

/////

Second Amended Petition at 9.  In view of the personal detail related in the course of these cases, one recalls C.H. Spurgeon's description of a village as "a hive of glass, where nothing unobserved can pass."

The little hamlet sits on State Highway 299.  There are several small communities along the Highway as it runs through Trinity National Forest.  One of the communities is Willow Creek, about ten to fifteen miles west of Hawkins Bar.  Next, is Salyer, some five miles west of Hawkins Bar, and the next is Hawkins Bar itself, at the

site of the gravel river crossing (bar) for which it is named.  It includes a general store with a delicatessen and BP gas pumps, and Simon Legree's Bar, located just across the highway from the store.  At the time of the events of this case, the Ironsides Trailer Park was next to the general store.  About a mile east of Hawkins Bar is Gray's Flat.

There is a United States Forest Service (USFS) Hawkins Bar Campground (Campground) on the Trinity River, below the Highway, accessed by a steep USFS access road leading from the Highway down to the Campground.  Just east of Hawkins Bar is the turnoff for Waterman Ridge, a logging artery, with smaller roads and spurs along its length.  Hop Summar's body was found at the end of one of the spurs.

Although some of the residents of Hawkins Bar had reasonably stable employment, many of them, including at least most of the persons important to this case, spent a great deal if not all of their time and money on drugs, alcohol and carousing, usually at the Campground.

### 2) The Population

**Gary "Hop" Summar**, the victim, was physically frail and disabled.  His nickname "Hop" derived from his severe limp, the result of multiple childhood surgeries to his back, hip, ankle and foot.  For a while he lived with Bernard "Bird" MacCarlie, in MacCarlie's trailer, at the Ironsides Trailer Park, paying him rent.  Then MacCarlie's girlfriend, Barbara Adcock, and her three children, Randy, Ryan, and Rachelle moved in, making the trailer very crowded.  This was at least partially due to Hop's serious failures of personal hygiene.  Hop lived on a monthly Supplemental Security Check deposited in his bank account on the first of each month, and usually consumed within a day or two, on alcohol for himself and friends.

**Robert "Red Beard" Bond**, the petitioner in this case, his wife Cindy, and their young daughter Crystal lived at the Campground while looking for permanent housing.

4

1    **Bernard "Bird" MacCarlie**, is described in Hop's synopsis, *supra*.  He

2    was tried with Bond and Leafe Dodds, and was convicted of conspiracy to commit

3    murder, two counts of kidnaping, mayhem, and also assault with a deadly weapon.  The

4    jury also found that MacCarlie used a weapon in the commission of the conspiracy, the

5    kidnapings, and the mayhem offenses.  A mistrial was declared as to the murder

6    charge.

7    **Leafe Dodds** and his then girlfriend Michelle were camped beneath a

8    large walnut tree, some five to six hundred feet from the Campground.  They were to be

9    (and it is believed later were) married at the local Harvest Moon Festival on October 5,

10   1991.  Leafe Dodds was tried jointly with Bond and MacCarlie, in the second of the

11   three related state trials.  Dodds was acquitted of all charges.

12   **Robert Fenenbock** lived in the vicinity of Hawkins Bar, and considered

13   the Campground his neighborhood.  He was tried with Sue Hamby and Cherri Frazier in

14   the first state trial.  Fenenbock was convicted of the First Degree Murder of Hop

15   Summar, but was acquitted of conspiracy to commit murder.

16   **Sue Hamby** lived in a dilapidated trailer she called "Hole in the Wall," in

17   Gray's Flat, roughly a mile east of Hawkins Bar.  She was romantically involved with Tex

18   Lockley in the past.  Hamby was tried in the first state trial and convicted of conspiracy

19   to murder Hop Summar, but was acquitted of murder.

20   **Cherri Frazier** arrived in Hawkins Bar about a week before the Harvest

21   Festival, to attend the wedding of Leafe Dodds and Michelle.  She camped under the

22   same Walnut tree as Leafe Dodds and Michelle.  Frazier was tried in the first state trial

23   and was convicted of conspiracy to murder Hop Summar, but was acquitted of murder.

24   **Barbara Adcock** is described in Hop's synopsis, *supra*.  She owned a

25   white Ranchero, which had a significant part in the events of this case.  She was tried in

26   the third state trial, with Anthony "Tex" Lockley.  She was convicted of conspiracy to

5

commit murder, first degree murder with special circumstances, and robbery.  Her
murder conviction was reversed on appeal.

**Anthony "Tex" Lockley** lived in a remote cabin, about forty-five minutes
from Hawkins Bar, and drove a red flatbed truck.  He was tried with Barbara Adcock in
the third state trial.  He was found guilty of conspiracy to commit murder.

**Earnest "Tatoo Earnie" Knapp**, his wife Trena Vader Knapp, and their
child lived at the Campground.  All charges against Earnest Knapp were dismissed
before trial.

**Steven Thayer** camped with Robert "Bert" Jones some one hundred
yards from the Campground, closer to the river, upstream from the others at the
Campground.  Thayer arrived only a few days before the murder.

**Robert "Bert" Jones** had been camped at the site of these events for
approximately five weeks.  **Michael "Scarecrow" Roanhouse** lived in a second trailer
on Sue Hamby's property.  **David Stegner** was the boyfriend of Cherri Frazier and had
previously been involved with Sue Hamby.  He drove a truck which he wrecked the
night of the murder.

**Michael "Black Mike" Sutton** was traveling to the east coast with
Gregory "Vito" Bullard and **Cindy "Rotten Cindy" Arends**, in Arends's van.  The three
arrived just days before these events.  Sutton had outstanding criminal charges in New
York and Texas.

**Gregory "Vito" Bullard** is described in Michael Sutton's synopsis, *supra*.
Bullard and Sutton claimed, falsely, that they were father and son.  **"Wino Brother"
Randy** was with a group known as "the Wino Brothers" who were from Eureka.  The
"Wino Brothers" did not intend to stay in the Hawkins Bar area and generally only
interacted with the rest of these individuals when invited to do so.

**Carl Hanks** was the cashier at the BP Mini Mart on the evening of

6

October 2, 1991.  **Patsy Brown** and her three children lived with  Sid Smith (who called himself "King of the Mountain," at his residence a little over two miles up the road to Denny.  Robert Fenenbock lived on the same property, but at a different residence, called Foggy Bottom.

**Randy Hogrefe**, the oldest child of Barbara Adcock (age nine at the time of the murder), was a main witness for the prosecution.  There was substantial litigation at the state level about his competence as a witness, upon grounds which included that he had at first claimed not to have seen anything relevant, but described very significant facts after he was told by a Sheriff's Investigator to pretend that he had seen what happened and then describe it.

**Susan Mendes** was friends with Bond's wife Cindy and testified at Bond's trial. **Harry Darr** lived in Cedar Flat.  **Sid Smith** is described in Patsy Brown's synopsis, *supra.*

### 3)    <u>Prelude</u>

A careful effort is made in this report to limit the facts to material either not contested by the parties or actually presented to Bond's jury.  In view of the confusion of multiple seemingly benighted witnesses with disjointed stories, and the technical nature of the claims of this petition, it is essential to focus on *what Bond's own jury heard,* rather than the full Ballad of Hawkins Bar.[1]  To that end, rather than adopt the statement of facts given by the California Court of Appeal, which dealt with the facts related to the appeals of multiple defendants in two of the three state cases, the transcripts have been painstakingly panned to find the nuggets pertaining to Bond, heard by his separate jury,

---

[1] The California Court of Appeal consolidated the appeals of Bond, MacCarlie, Adcock and Lockley, resulting in a single statement of facts that not only referenced the testimony heard by Bond's jury and MacCarlie/Dodd's jury, but also the testimony heard by the Adcock/Lockley jury.

untainted by the extraneous words and deeds of his fellow citizens of Hawkins Bar.[2]
The sequence of events related here is perforce disjointed and not without gaps,
because different witnesses testified at the three trials, and some told different stories at
various times.

When Barbara Adcock and her three children moved into Bernard "Bird"
MacCarlie's trailer, where he and Hop Summar lived, Adcock was quickly dissatisfied
with Hop's presence.  Soon, she began spreading the story that Hop had sodomized
her youngest child, Rachelle, who was five years old.  Although Rachelle was examined
by experts, both by interview and physical examination, no credible evidence of
molestation was ever developed.

Adcock, nevertheless, began to tell seemingly everyone she encountered
that Hop had molested her daughter and that something should be done about it.  It
became a common topic of conversation, and talk of vigilante action spread in the
community.

The time-line of events immediately leading up to the death of Hop
Summar is difficult to reconstruct, because the denizens of Hawkins Bar were not wont
to wear watches, and were habitually intoxicated.  A rough sequence is here attempted,
using the testimony presented to Bond's jury.

### 4)   October 1, 1991

Robert Jones testified that at the main campsite at the Campground that
evening, he was at a get-together with Bernard MacCarlie, Barbara Adcock, Robert
Bond, Leafe and Michelle Dodds, Cherri Frazier, Sue Hamby, Steven Thayer, Michael
Sutton, Gregory Bullard, Cindy Arends, and others.

---

[2] The statement of facts found in respondent's answer frequently cites to the
transcripts from the two other state cases.  The statement of facts found in petitioner's
second amended petition does not cite to any trial transcripts.

1        Hop Summar's name came up and Frazier said that "the motherfucker

2   should be killed."  Adcock "was pretty much saying exactly the same thing."  Jones did

3   not recall exactly what Bond said, but it was "something like something ought to be

4   done."  Jones opined that Hop "had not done it."  Jones had stated his disbelief in Hop's

5   guilt on several prior occasions.  After Jones expressed this opinion at the get-together,

6   the attitude toward him changed.  People did not want to talk to him and they gave him

7   "looks."  These people included Frazier, MacCarlie, Adcock, Bond, Leafe and Michelle

8   Dodds, and Hamby.

9        Later, Sutton heard Bond, MacCarlie, and Adcock talking about, "Doing

10  him, doing him tonight, take care of that sucker, etc...".  Sutton also had a conversation

11  with Frazier, Adcock, and Hamby, in which Frazier said that Sutton looked like he could

12  take care of himself, and that the women would be much appreciative if he would help

13  them kill Hop.  Hamby then asked Adcock, "What do you want me to do with him?"

14  Sutton walked over to Arends and Bullard and told them about the conversation.

15  Bullard told Sutton to stay close and not get involved.  Later that evening, Hamby

16  apologized for the earlier conversation, and told Sutton to just not get involved.

17       Later that same evening Hop entered Simone Legree's Bar, "a little

18  distraught, mad, and it seemed like he had been drinking a little."  Hop said that Harry

19  Darr had just tried to get Hop into Darr's pickup truck and had struck Hop, possibly with

20  a pistol.  Hop was bleeding from a roughly half inch "deep gash" on the side of his face.

21  One of the bar's patrons cleaned up the cut and used a Band-Aid to cover it.  Some

22  time later Michael Roanhouse and Hamby encountered Hop at Simon Legree's.  Hop

23  was obviously intoxicated.  He left with Hamby and Roanhouse and spent the night in

24  Hamby's trailer.

25  /////

26  /////

### 5)   October 2, 1991

#### a.   Prior to The Murder

Steven Thayer testified that on the morning of October second, he woke up, "rolled [his] camp up, and told Jones he was leaving.  Jones decided to go with him, and the two walked toward the highway.  The two men came across Frazier, who invited them to have a beer with her.  The three, along with Leafe and Michelle Dodds, drank beer.  David Stegner might have been there as well.  During that period, Frazier and Michelle Dodds said they believed that Hop had molested Adcock's daughter and needed "his ass kicked."  Thayer and Jones expressed their belief that Hop was not guilty.  The group drank beer for two and a half to three hours, during which Thayer probably drank twenty to twenty-five cans of beer.  The group then moved back to Jones' campsite, where Thayer blacked out.

When Thayer came to, he was on his feet, walking through Bond's campsite.  Soon thereafter, Thayer saw MacCarlie, who told him it would be a good idea if he collected his gear and got the hell out of the camp area, specifically Hawkins Bar.  Adcock may have said the same thing.  Thayer testified that he believed he was told to leave because he had expressed his opinion that Hop had not molested Adcock's daughter.

Thayer and Jones packed their belongings and headed out of camp.  On their way, the two were stopped by a car, and MacCarlie and Knapp jumped out.  MacCarlie accused Jones of striking one of the women, and told Thayer and Jones that he was taking them back to the main campsite.  Thayer agreed to go after he saw that MacCarlie had a knife.  Upon reaching the campsite, the four men got out of the vehicle.  Thayer believed he was pushed to the ground by MacCarlie, who also shoved Jones.  After getting to his feet, Thayer left.

/////

1        Jones' testimony concerning these events was similar to Thayer's.  Jones

2 said that when he awoke on October second, he also decided to leave Hawkins Bar.

3 While walking around saying goodbye to people, he ran into Michelle Dodds, who told

4 him it was her birthday and insisted that he drink beer with her.  Jones, Michelle Dodds,

5 Frazier, Randy [Wino Brother] and Thayer drank beer for "a couple of hours."  Jones

6 personally drank a 12-pack of beer and a half jug of wine and the group as a whole

7 consumed three cases of beer and three or four jugs of wine.  When no alcohol

8 remained, the group went back to Jones' camp, where they cooked hamburgers and

9 eggs.  Jones then took a nap.

10       Two to three hours later Jones was awakened by Thayer, who told him

11 that they had just been told to get out of camp.  Jones walked back to where the group

12 had been drinking to find out why.  There he encountered Michelle Dodds who yelled,

13 "Get the fuck out of here," and threw a rock at him.  On cross-examination Jones

14 acknowledged that Michelle Dodds might have thrown the rock at him because he was

15 accused of stealing food.  On redirect, Jones agreed that it would be truthful to

16 characterize his dispute with Michelle Dodds as involving the fact that Jones disagreed

17 with the group's belief that Hop had committed molestation; the group's belief that

18 Jones had called Adcock a liar; an accusation that Jones had stolen food; and an

19 accusation that Jones had assaulted Michelle Dodds.

20       Jones headed for the main campsite, but Michelle Dodds ran through a

21 shortcut, arriving before Jones and screaming help me.  Adcock and Frazier joined

22 Michelle Dodds, and confronted Jones.  Frazier pushed Jones and yelled "Get the fuck

23 out of here."  Adcock threatened Jones with a baseball bat.  Jones turned back toward

24 his own camp.

25       Sutton's testimony about these events was somewhat different, as he

26 testified that Jones was beaten with a stick by Michelle Dodds.  Arends, Hamby, Frazier

1    and Adcock were present and armed.  Adcock had a baseball bat, Arends an axe, and

2    Hamby a .25 caliber pistol.  Sutton believed that Jones was beaten because on the

3    previous day he had commented to certain people that he did not believe that Hop was

4    either capable of, or had done what he was being accused of.  After about ten minutes,

5    Jones left the area.

6            While walking to his own campsite, Jones encountered Thayer.  Soon

7    after that, MacCarlie, with Ernie Knapp in the passenger seat, drove a white Ranchero

8    towards Jones and Thayer, nearly running into Jones.  MacCarlie jumped out and

9    attempted to stab Jones a few times.  Jones blocked all but one of MacCarlie's stab

10   attempts.  MacCarlie ordered everybody into the back of the Ranchero, and proceeded

11   to the main campsite.

12           Arriving at the campsite, Jones saw Bond, Leafe and Michelle Dodds,

13   Adcock, Bullard, Arends, and Frazier.  The group shouted vulgarities, and MacCarlie

14   asked Jones if he knew what kind of frame of mind MacCarlie was in.  Jones responded

15   that it looked like MacCarlie wanted to kill somebody.

16           Jones saw that Thayer had been pushed down, and then had gone up the

17   hill.  Jones said that it was MacCarlie that pushed Thayer, and that as Thayer was going

18   up the hill, Bond "kicked him in the ass."  That was the last Jones saw of Bond.

19           MacCarlie then bent Jones over the tailgate of the Ranchero and put a

20   knife to his ear, saying "I'll cut your fucking ear off."  Jones heard shouting from several

21   people, including Frazier, Adcock, and Bond.  Jones then felt the knife blade cut into his

22   neck.  Jones grabbed MacCarlie's hand, which was holding the knife and made a little

23   slice in his own neck.  Jones was then able to stand up and MacCarlie put the knife

24   away.  At some point during the scuffle with MacCarlie, Jones heard someone yell "Hop

25   is in camp."

26   /////

1    Around the same time the Jones/Thayer events were occurring at the

2    Campground, Roanhouse was walking to the Hawkins Bar Store, where he encountered

3    Tex Lockley.  The two men drove towards the Campground in Lockley's red flatbed

4    truck.  At about 6 p.m. they encountered Hop, who jumped in the back of the truck.  The

5    three men proceeded to the Campground.

6    When Roanhouse, Lockley and Hop arrived at the main campsite, the

7    people present began "hollering 'Get him out of here.'"  In response to the shouts,

8    Lockley backed his truck up and returned to a level spot at the top of the hill.  There the

9    three men encountered Bond and Fenenbock, who both punched Hop in the head.

10   According to the prosecution, Roanhouse told Sargent Kartchner that the men accused

11   Hop of being a child molester, to which he replied "I'm not guilty, I'm not guilty."

12   Roanhouse testified however that he could not recall making that statement.

13   Thayer, who was now making his way out of the Campground, came

14   across Roanhouse and Hop in the pickup truck at the top of the hill.  Thayer testified

15   that there was a third person seated in the truck, but he did not see who it was.

16   Roanhouse meanwhile got a can of beer and some tobacco from Lockley, and began

17   walking down the road toward the main campsite at the Campground.

18   Again, Sutton's testimony was somewhat different, as he testified that he

19   saw MacCarlie drive the Ranchero out of the main campsite up towards the top of the

20   hill with Bond in the passenger seat.  Sutton "couldn't be certain" but believed Adcock's

21   youngest child, Randy Hogrefe, was in the back of the vehicle.  Roanhouse testified that

22   while he was walking down towards the campsite he was passed by MacCarlie, who

23   was driving the Ranchero up towards the top of the hill.

24   When the Ranchero arrived at the top of the hill, Thayer's belongings were

25   in the back.  Thayer removed them and did not see anyone in the back of the vehicle.

26   Thayer overheard Hop Summar say:

13

1
2

> Hey, man, I didn't do it, you know.  You
> know, what are you going to do?  Kill me
> and throw me in the bushes?

3  MacCarlie responded, "Something like that, yeah."  Harry Darr may have been present

4  at that time, and may have told Thayer it would be a good idea for him to leave.

5          Thayer left the Campground and began hitchhiking on Highway 299.

6  After ten to fifteen minutes of hitchhiking, he saw the Ranchero come off the dirt road

7  that leads to the Campground, turn onto the highway, and travel in the same direction

8  that he was hitchhiking.  Bond was driving the Ranchero, with MacCarlie in the

9  passenger seat and Hop Summar sitting between them.  Fifteen to twenty minutes later,

10  Jones caught up to Thayer, and told Thayer that he had been stabbed.

11          Meanwhile, down at the main campsite, Roanhouse, Hamby, and Trena

12  Vader Knapp had decided to go pick up a grill for a barbeque.  The three departed in

13  Hamby's truck.  As they passed the spot where Roanhouse had left Hop, Bond,

14  Lockley, Fenenbock and the truck, the truck and all the men were gone.

15          Jones saw Hamby's truck leave the Campground while he was hitchhiking.

16  In fact it was the only vehicle he saw leaving the Campground.  Jones and Thayer

17  eventually caught a ride to the town of Willow Creek, where they called the police.

18  Officers responded, and Jones told them he was concerned for Hop's safety.  Jones

19  was taken to a hospital by ambulance, and later to the Eureka Police Department,

20  where he discussed these events with law enforcement personnel.  Thayer rode in a

21  patrol car back to the Campground to look for Hop.

22          Meanwhile, after hunting for the grill for about an hour and twenty minutes,

23  Roanhouse, Hamby, and Trena Knapp returned to the Campgroud somewhere between

24  7:30 p.m. and 8:00 p.m., finding Tattoo Ernie Knapp, Randy (the Wino Brother), Barbara

25  Adcock, and her three children.  The group barbequed and ate dinner.  According to

26  Roanhouse, Adcock's son, Randy Hogrefe, did not seem to be upset during this time.

1    Approximately two hours later, Roanhouse saw that Lockley was at the campsite.

2    Bond, Fenenbock, and MacCarlie were not at the main campsite during the barbeque,

3    or for several hours after.

4          After an argument between Stegner and Frazier, Stegner drove his truck

5    from the Campground toward the Highway and wrecked it.  The wreck occurred

6    approximately forty-five minutes after Roanhouse observed that Lockley was in the

7    campsite.  Prior to the accident Stegner had done "a lot of drinking and a lot of drugs."

8    Roanhouse, who acknowledged that he too "pretty much drank alcohol throughout the

9    day" and was intoxicated, watched emergency personnel, law enforcement and a tow

10   truck arrive before walking home.

11   /////

12                    **b.    The Murder**

13         At Bond's trial, only two people, Randy Hogrefe and Bernard MacCarlie,

14   testified about the actual events of Hop's murder.  Their  testimony differed significantly.

15                    **i.    Randy Hogrefe**

16         Randy Hogrefe, who was nine years old at the time of the murder, testified

17   that when Lockley drove his truck into the campground with Hop Summar in the back,

18   Hogrefe's mother, Barbara Adcock had "a bunch of us kids get into the bathroom for

19   some reason."  While he was in the bathroom, Hogrefe heard yelling.

20         The next thing Randy remembered was getting into the Ranchero to go to

21   sleep.  In the bed of the Ranchero was a mattress and some blankets.  Randy

22   remembered the Ranchero then driving towards "some mountains" with Bond,

23   Fenenbock, MacCarlie, Leafe Dodds and Hop.  After traveling a "bumpy zig-zag road"

24   the Ranchero arrived at a "timber place," where the four men stabbed Hop.

25         Hogrefe heard Hop yelling and screaming while he was being stabbed.

26   Hogrefe thought that all four men had knives but did not "remember very well."  Randy

                                        15

also heard a police siren and someone say, "The cops are coming, the cops are coming."  After stabbing Hop, the four men drug him over to a stump.

The men then got back in the Ranchero and traveled to the home of Sid Smith.  Bond and Leafe Dodds however, "got out somewhere" prior to Smith's house.  Hogrefe knew he was at Smith's home because the road is bumpy and because he recognized the sound of Smith's dog barking.  According to Hogrefe, MacCarlie then left Smith's and drove the Ranchero back to the scene of the murder and then to the BP gas station, where he discovered Hogrefe.

Hogrefe testified that when he was discovered by MacCarlie he "started running" but eventually "came back."  MacCarlie then took off his own shoes and put them in a trash can.  Although the BP was closed, Randy testified that MacCarlie was let in and bought beer and a sucker for Hogrefe.  The two then traveled in the Ranchero back to the Campground but "were backed up" by police officers.  Randy then fell asleep.

On cross-examination Randy was questioned about the people who were "helping him remember," as well as some possible contradictory statements he had made.  Randy testified that sometime after these events he was driven to the log landing and told that was the spot that Hop's body was found.  Defense counsel suggested that Hogrefe previously stated that he had never been to that spot prior to being told that it was where Hop's body was found.

Hogrefe also testified that it was police officers who told him MacCarlie had taken his shoes off and put them in the garbage can.  The Respondent acknowledges that "[i]t would be idle to pretend that [Hogrefe's] story was entirely consistent."  Indeed, Sergeant Kartchner testified that Hogrefe at one point said that he had made the whole story up.

/////

16

## ii.   **Bernard MacCarlie**

MacCarlie testified that the Jones/Thayer incident occurred because Michelle Dodds told MacCarlie that Jones had kicked her in the stomach.  After MacCarlie "came back out" from having "snapped" on Jones, he heard voices saying that Hop was at the top of the hill.  MacCarlie drove the Ranchero up the hill to talk to Hop about the molestation allegations.  MacCarlie did not see Hogrefe in the Ranchero. When MacCarlie reached the top of the hill, Hop was alone.  MacCarlie denied ever telling Hop he was going to kill him.

MacCarlie and Hop "ended up at the log landing."  According to MacCarlie, once at the log landing:

> It's weird how this happened, okay.  I was sitting in the truck. While I'm sitting in this truck, I'm also up in this tree and I'm watching.  I'm looking down at this scene at the log landing where this guy is sitting in this truck.  I didn't know it was me at the time.  And he's sitting there, and all of a sudden he just backhands three times in this guy's chest area.  And I'm like - - as I'm watching this the next thing I know he backhands him two or three times with his fist.  It's like I'm watching a scene out of a movie and I'm like whoa.

> The guy gets out of the truck, runs around the other side, grabs this guy, pulls him out, throws him up on the bank.  He rolls down a little bit.  This guy kicks him a couple of times to turn him over.  Then he just goes off and starts stabbing him everywhere.

> After whatever amount of time it took, the guy stops, and he looks up like this.  And he was looking around the forest, and I noticed it's me, and I just freaked out.

MacCarlie denied ever hearing Adcock say that Hop, "should be killed" or that they, "ought to do him," and he never heard anyone say, "are you in on it or not." With respect to the whereabouts of Bond and Leafe Dodds during Hop's murder, MacCarlie testified:

> Q.      Did you - - did you see Leafe Dodds and Bob Bond
>          help anybody drag this body aside by the tree?

17

1    A.     I hadn't seen Leafe all (sic).

2    Q.     From the tree?

3    A.     At all, period.  At the campground at all.  Bob Bond
4 was not there, either.  I had met Bob one night or one day, as a matter of fact.

5    Q.     So - -

6 THE COURT: Let me interrupt.  When you say not
7 there, not where?  You say Bob Bond was not there?

8 THE WITNESS: Well, he asked me if I seen him drag
9 or pull or - - and he was not there dragging or pulling anybody.

THE COURT: When you say "there," you are talking
10 about the log landing?

11 THE WITNESS: Right.

12 THE COURT: I just didn't know whether it was the
13 campground or what.

14 [PROSECUTOR]: Thank you.  I wanted to clarify that.

15 Q.  You meant you didn't see him there in the picture from the tree at the log landing dragging Hop?

16 A.  No, I did not see Bond or Dodds.

17 Q.  Okay.  You are not suggesting to this jury that they
18 weren't there, you just didn't see them there?

A.  I did not see them.
19 /////

20       MacCarlie left the log landing and returned to the Campground.
21 Sometime later he decided to go to Sid Smith's house.  Hogrefe got permission from
22 Adcock to go with MacCarlie.  Bond and Fenenbock accompanied them.

23              **c.**    **After The murder**

24       According to Patsy Brown, who was living with Sid Smith at the time, on
25 the evening of the October second, at roughly 8 p.m. Brown heard her dog barking and
26 noticed the Ranchero pulling up.  Bond and Fenenbock "jumped out of the back."

1   Fenenbock was "sloshed" and Bond was "a little tipsy."  Bond was wearing a flannel

2   shirt and jeans.  Both men were "fairly normal" but Bond "was kind of upset" because he

3   believed his wife was leaving him and taking their child with her.  Nevertheless the two

4   men were "quite jovial and laughing and joking."  Brown denied previously telling police

5   that when the two arrived they were breathing heavy and very excited.  Brown did not

6   notice any blood on Bond and testified that she "would have noticed that."

7           After leaving Smith's, MacCarlie and Hogrefe went to the BP station where

8   MacCarlie attempted to buy cigarettes and beer but was turned away by the cashier

9   because the store was closed.  Carl Hanks, the cashier at the BP Mini Mart on the

10  evening of October second, 1991, testified that shortly after 9:00 p.m. that evening

11  MacCarlie walked up to the store's entrance wearing blue jeans and no shirt.  Hanks

12  told MacCarlie the store was closed, and MacCarlie left.  MacCarlie testified that he and

13  Hogrefe headed back to the Campground but the road was blocked because of

14  Stegner's accident.

15          Bond and Fenenbock left the Smith residence about an hour or two after

16  they arrived.  Shortly after their departure Brown heard a vehicle start that sounded like

17  Fenenbock's truck.  She believed that the two got in Fenenbock's truck, which had been

18  parked up the hill at his residence all day, coasted it down the hill, and then started it.

19          On cross-examination, Brown denied that Bond ever said, "You don't have

20  to worry about that child molester anymore, we took care of him."  On redirect Brown

21  denied that she changed her testimony because she was worried about her safety.

22          Meanwhile, at about 10:00 p.m., Sergeant Kartchner responded to the

23  report that Hop Summar was missing.  After visiting a few residences, Kartchner arrived

24  at the cabin of Ron Ammon and Ila Olson.  While walking up to the doorway Kartchner

25  could overhear a conversation characterized by "laughter, happiness," and "joking

26  around."  Inside with Ammon and Olson were Bond and Fenenbock.  Bond, Fenenbock

1    and Amon appeared to be "well under the influence."

2          Kartchner noted that both Bond and Fenenbock were wearing a shirt and

3 pants, and that while they were "not the cleanest clothes" Kartchner had seen, the two

4 looked like, "a lot of the people do" in the Hawkins Bar area.  Kartchner conversed with

5 the four for roughly five minutes and decided to leave because he "felt Hop wasn't

6 there."  On cross examination,  Kartchner acknowledged that he did not observe any

7 blood on Bond's clothing or hands.

8          Kartchner left the cabin and traveled to the top of the hill location near the

9 Campground in response to a reported discovery.  At the top of the hill Kartchner saw

10 the white Ranchero.  Behind where the Ranchero was parked Kartchner saw some

11 blood, a necklace, a large clump of hair and a Band-Aid.  While Kartchner was

12 photographing the Ranchero, Hogrefe's "head popped up."  Hogrefe looked at

13 Kartchner and "went right back down and covered up with the blanket again."

14          After photographing the Ranchero Kartchner spoke with MacCarlie, who

15 was sitting in the driver's seat.  Kartchner noticed that MacCarlie had a "fresh cut" on his

16 finger that looked "extremely clean, like it had just been washed."  Kartchner also

17 noticed that there was a knife sheath on MacCarlie's belt, but no knife, and that

18 MacCarlie was not wearing any footwear.

19          After the roadway was cleared Kartchner went down to the Campground.

20 While Kartchner was interviewing and photographing those present at the Campground

21 he saw Bond "come slide into the camp from one of the trails."  Bond was not wearing

22 any footwear, but was wearing the same clothes as he was wearing when Kartchner

23 encountered him at the Cabin.  Kartchner did not see any knife or a knife sheath on

24 Bond.  Kartchner briefly talked with Bond and had him photographed.

25 /////

26 /////

**6)**   <u>**October 3, 1991**</u>

Susan Mendes testified that during the early morning of October third, 1991, she, Bond's wife Cindy, and two other people drove to the Hawkins Bar Campground to find Bond.  Cindy retrieved Bond, and the van departed.

While riding in the van Bond began "talking about how things went down." His wife said, "Why were you so stupid to get involved in it."  Bond responded that he "was just protecting all the kids or something like that."  Bond also said that "he finally confessed to it after they had beat him first."  He then said, "Well, we don't have to worry about it now.  We took care of it.  We took care of that child molester."  Mendes asked Bond if she should worry about coming across Hop's body in the woods.  Bond responded  "Don't worry about it.  We took care of it.  There is only three of us that really know where it's at."

Once back at Mendes' house, they were joined by Robert Fenenbock. Mendes recounted a discussion she heard concerning what happened when Bond and Fenenbock returned to camp the night before.

> Okay.  I guess they come walking up to the campground, um, to the top and there is cops all over.  It was either Bob - - I'm not sure which Bob, Bob Bond or Bob Fenenbock - - was trying to talk to [MacCarlie], and he was handcuffed up against the car and kept telling him, "Go away, go away," you know, because he didn't see all the cops there.
>
> And they had come down and was - - Bob Bond first came sliding down the hill, and when he got up, there was cops right there and stuff and they were asking him about the murder and stuff.  And then they are laughing how they didn't even check their hands and stuff, and I guess they had blood all over them.

Later at Mendes' home Bond and Fenenbock discussed "going out of state."

On cross-examination, Mendes acknowledged that she originally told police that Bond said he had "only struck Hop Summar."  Mendes also acknowledged that she contacted the police to change her story the day after her home was raided by

police officers and 276 marijuana plants were discovered.

Sutton testified that back at the Campground that morning  he saw Hamby take Hop's backpack out of Lockley's truck, remove money from it and put the backpack in her truck.  Back at Hamby's home, Roanhouse saw her wiping the backpack off with a wet cloth.  Hamby turned the backpack over to Deputy Litts later that afternoon.

### 7)   **The Body**

On October sixth, 1991, Hop's decomposing body was discovered at a logging site off Highway 299.  A knife was found on a log about 50-75 feet from the body.  The knife was covered in what would later be identified as Hop Summar's blood.

An autopsy revealed that Hop died from over seventy stab wounds and bludgeoning.  His body had been horrifically beaten, his left ear removed while he was alive,  and his left eye gouged out.

/////

### 8)   **Miscellaneous Forensic Evidence**

The investigation into Hop Summar's murder began almost immediately after Jones reported his concerns, and continued for sometime after Hop's body was discovered.  Early on Lockley's red truck was ordered seized after a sheriff's deputy noticed blood stains on the vehicle.  Tests revealed stains consistent with Hop's blood type.  Also submitted for examination were pants belonging to Lockley.  Blood consistent with Hop's was found on those pants.

A wallet and a broken mirror belonging to MacCarlie were examined as well.  Tests revealed human blood on those items consistent with either Hop Summar's or Ernie Knapp's.

With respect to Bond, two sets of personal effects were examined.  The first consisted of  "white socks, underpants, a blue t-shirt, pants, Levi's and tennis shoes."  The second  consisted of denim pants, a long sleeve shirt, a Bic lighter, a

leather belt, a metal belt buckle, and a blue velcro wallet.  No blood was found on any of these items.

The Ranchero was also examined, and no human blood was detected.

## B.   State Courts

Nine persons, Robert Bond, Bernard MacCarlie, Leafe Dodds, Robert Fenenbock, Ernest Knapp, Anthony Lockley, Barbara Adcock, Cherri Frazier, and Sue Hamby were charged in December of 1991 and October of 1992 with various crimes relating primarily to the death of Gary Hop Summar.  There were extensive and voluminous pretrial proceedings.  Ultimately all charges as to Ernest Knapp were dismissed.  The remaining eight persons were tried in three separate cases in two different counties.  With the exception of Dodds, all were convicted of various offenses, and the post-trial proceedings were eventually concluded.

## C.   Federal Court

Bond's federal habeas corpus proceeding has been pending for a decade, consumed by the vast state record, the five related federal cases pending in this Court, and overwhelming procedural issues.  These included numerous defense motions, a stay for state exhaustion proceedings, two amended petitions, a motion to dismiss and a response.  On September 9, 2005, Magistrate Judge Dale A. Drozd held a hearing, resulting in a lengthy report and recommendation resolving complex procedural matters, particularly the respondent's motion to dismiss, involving circuitous issues concerning the timeliness of multiple claims.  Judge Drozd's comprehensive report of September 11, 2006, was adopted by Senior United States District Judge Lawrence K. Karlton on July 6, 2007.  The Court having resolved the  labyrinthine procedural questions, Bond was given time to file a second amended petition raising the four claims remaining in the case.

/////

1    On May 15, 2009, Bond filed a second amended petition.  Respondent

2  filed an answer on July 9, 2009.  On October 26, 2009, Bond notified the court that he

3  did not intend to file a traverse.  This matter is therefore ready for resolution.

4  **IV.    APPLICABLE STANDARD OF HABEAS CORPUS REVIEW**

5    An application for a writ of habeas corpus by a person in custody under a

6  judgment of a state court can be granted only for violations of the Constitution or laws of

7  the United States.  28 U.S.C. § 2254(a).

8    Federal habeas corpus relief is not available for any claim decided on the

9  merits in state court proceedings unless the state court's adjudication of the claim:

10    (1) resulted in a decision that was contrary to, or involved an
       unreasonable application of, clearly established federal law,
11       as determined by the Supreme Court of the United States; or

12    (2) resulted in a decision that was based on an
       unreasonable determination of the facts in light of the
13       evidence presented in the State court proceeding.

14  28 U.S.C. § 2254(d).

15    Although "AEDPA does not require a federal habeas court to adopt any

16  one methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain

17  principles which guide its application.

18    First, the "contrary to" and "unreasonable application" clauses are

19  different.  As the Supreme Court has explained:

20    A federal habeas court may issue the writ under the
       "contrary to" clause if the state court applies a rule different
21       from the governing law set forth in our cases, or if it decides
       a case differently than we have done on a set of materially
22       indistinguishable facts.  The court may grant relief under the
       "unreasonable application" clause if the state court correctly
23       identifies the governing legal principle from our decisions but
       unreasonably applies it to the facts of the particular case.
24    The focus of the latter inquiry is on whether the state court's
       application of clearly established federal law is objectively
25       unreasonable, and we stressed in Williams [v. Taylor, 529
       U.S. 362 (2000)] that an unreasonable application is different
26       from an incorrect one.

24

1   Bell v. Cone, 535 U.S. 685, 694 (2002).  It is the habeas petitioner's burden to show the

2   state court's decision was either contrary to or an unreasonable application of federal

3   law.  Woodford v. Visciotti, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).  It is appropriate to

4   look to lower court decisions to determine what law has been "clearly established" by

5   the Supreme Court and the reasonableness of a particular application of that law.  See

6   Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 2000).

7          Second, the court looks to the last reasoned state court decision as the

8   basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

9   So long as the state court adjudicated petitioner's claims on the merits, its decision is

10  entitled to deference, no matter how brief.  Lockyer, 538 U.S. at 76; Downs v. Hoyt, 232

11  F.3d 1031, 1035 (9th Cir. 2000).   Where the state court reaches a decision on the

12  merits but provides no reasoning to support its conclusion, a federal habeas court

13  independently reviews the record to determine whether habeas corpus relief is available

14  under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003); Pirtle v.

15  Morgan, 313 F.3d 1160, 1167 (9th Cir.2002).  When it is clear that a state court has not

16  reached the merits of a petitioner's claim, or has denied the claim on procedural

17  grounds, the AEDPA's deferential standard does not apply and a federal habeas court

18  must review the claim de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.2003).

19         Third, in determining whether a state court decision is entitled to

20  deference, it is not necessary for the state court to cite or even be aware of the

21  controlling federal authorities "so long as neither the reasoning nor the result of the

22  state-court decision contradicts them."  Early v. Packer,  537  U.S. 3, 8 (2003).

23  Moreover, a state court opinion need not contain "a formulary statement" of federal law,

24  so long as the fair import of its conclusion is consonant with federal law.  Id.

25  /////

26  /////

25

**V.     DISCUSSION OF PETITIONER'S CLAIMS**

    **A.     Separate Overt Acts**

        **1)     Description of Claim**

In the sixth amended information, the District Attorney charged Bond with conspiracy to commit murder.  Twenty-one overt acts were alleged in connection with that conspiracy.  Clerk's Transcripts ("CT") at 3027-3030.  The first three overt acts alleged were:

OVERT ACT 1

On or about October 1, 1991, BARBARA ADCOCK asked for the help of a number of persons at the Hawkins Bar campground to take care of GARY L. "HOP" SUMMAR, who she said had molested her daughter.

OVERT ACT 2

On or about October 1, 1991, a number of conspirators talked in the Hawkins Bar Campground of what was to be done to suspected child molester GARY L. "HOP" SUMMAR.

OVERT ACT 3

On or about October 1, 1991, BERNARD LEROY MACCARLIE went around to different individuals asking if they were "in on it or not."

/////

CT at 3027.

Under California Law a conspiracy conviction requires that the agreement to commit murder must be accompanied by an overt act other than the act constituting the formation of the agreement itself.  Bond argues that these three overt acts, if they did occur, were part of the formation of the conspiracy agreement itself.  Second Amended Petition at 17.  Bond further argues that by including overt acts that were not independent of the formation of the agreement the state was relieved of the burden of proving each element of the conspiracy.  Id. at 18.

/////

1          **2)    Applicable Law**

2          A challenge to jury instructions does not generally state a federal

3    constitutional claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing

4    Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197

5    (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury instruction

6    cannot be merely "undesirable, erroneous, or even universally condemned, but must

7    violate some due process right guaranteed by the Fourteenth Amendment."  Prantil v.

8    State of California, 843 F.2d 314, 317 (9th Cir. 1987) (quoting Cupp v. Naughten, 414

9    U.S. 141, 146 (1973)) (internal quotes omitted).  To prevail on such a claim the

10   petitioner must demonstrate that an erroneous instruction "so infected the entire trial

11   that the resulting conviction violates due process." Prantil, 843 F.2d at 317 (quoting

12   Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987)).  See also Middleton v. McNeil,

13   541 U.S. 433, 437 (2004).  In making its determination, this court must evaluate the

14   challenged jury instructions "in the context of the overall charge to the jury as a

15   component of the entire trial process."  Prantil, 843 F.2d at 317 (quoting Bashor v.

16   Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).

17          An error in the giving of a jury instruction is a "trial error" as distinct from a

18   "structural defect."  Arizona v. Fulminante, 499 U.S. 309, 310 (1991); Drayden v. White,

19   232 F.3d 704, 709 (9th Cir. 2000).  A federal court may grant habeas relief based on

20   trial error only when that error " 'had substantial and injurious effect or influence in

21   determining the jury's verdict.' "  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

22   (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  See also California v.

23   Roy, 519 U.S. 2, 4-6 (1996) (applying harmless error standard to jury instructions that

24   omit reference to an element of the crime); Rice v. Wood, 77 F.3d 1138, 1144 (9th Cir.

25   1996) (Observing with respect to the erroneous instruction at issue in that case that

26   "[t]he Supreme Court has nevertheless repeatedly held that giving such an instruction is

27

only trial error, subject to harmless-error analysis.")  Under the harmless error analysis, the petitioner is entitled to habeas relief if the reviewing court is in "grave doubt" as to whether the jury instruction error had a substantial and injurious effect or influence on the jury's verdict.  Polk v. Sandoval, 503 F.3d 903, 911 (9th Cir. 2007); Morris v. Woodford, 273 F.3d 826, 833 (9th Cir. 2001); Coleman v. Calderon, 210 F.3d 1047, 1051 (9th Cir. 2000).

### 3)   Discussion

Bond argues that the first three overt acts alleged were part of the agreement to commit the conspiracy.  Bond does not address or attack the other eighteen overt acts alleged.   He argues that because of the first three overt acts, the jury could have convicted him of conspiracy to commit murder based on overt acts that were "not separate from the agreement that formed the basis for his conspiracy conviction."  Second Amended Petition at 18.  The trial judge's instructions to the jury however undermine that argument.

The trial judge instructed Bond's jury that:

A conspiracy is an agreement entered into between two or more persons with the specific intent to agree to commit the offense of murder and with the further specific intent to commit such offense *followed by an overt act* committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement.  Conspiracy is a crime.

In order to find a defendant guilty of conspiracy, *in addition to proof of the unlawful agreement* and specific intent, there must be proof of the commission of at least one of the overt acts alleged in the Information.

It is not necessary to the guilt of any particular defendant that the defendant personally committed the overt act if he was one of the conspirators when such an act was committed.

The term "overt act" means any step taken or act committed by one or more of the conspirators which *goes beyond mere planning or agreement* to commit a public offense and which

1        step or act is done in furtherance of the accomplishment of
         the conspiracy.
2
         To be an "overt act," the step taken or act committed need
3        not, in and of itself, constitute the crime or even an attempt
         to commit the crime which is the ultimate object of the
4        conspiracy.  Nor is it required that such step or act, in and of
         itself, be a criminal or an unlawful act.
5
         Each member of a criminal conspiracy is liable for each act
6        and bound by each declaration of every other member of the
         conspiracy if such act or such declaration is in furtherance of
7        the object of the conspiracy.

8        The act of one conspirator pursuant to or in furtherance of
         the common design of the conspiracy is the act of all
9        conspirators.

10   RT at 5842-43 (emphasis added).

11          Thus the jury was instructed that in order to find Bond guilty of conspiracy

12   to commit murder, there must be a finding of an agreement, with the specific intent to

13   agree to commit the offense of murder, together with the further specific intent to

14   commit murder, "followed by an overt act."  The jury was further instructed that "in

15   addition to proof of the unlawful agreement" there must have been proof of the

16   commission of at least one of the overt acts alleged.  The jury was also instructed that

17   an overt act was something that went "beyond mere planning or agreement."

18          In the absence of evidence to the contrary, it must be assumed that the

19   jury followed the instructions as given.  See Weeks v. Angelone, 528 U.S. 225, 234

20   (2000); Richardson v. Marsh, 481 U.S. 200, 206 (1987) (noting the "almost invariable

21   assumption of the law that jurors follow their instructions"); Francis v. Franklin. 471 U.S.

22   307, 324 n. 9 (1985).  Bond has not presented any evidence to the contrary.

23          Further, even if Bond had established a claim of error, and he has not, he

24   has failed to raise "grave doubt" as to whether that error had a substantial and injurious

25   effect or influence on the jury's verdict.  Bond therefore is not entitled to relief on this

26   claim.

**B.   Jury Instruction**

**1)   Description of Claim**

Bond argues the trial court improperly instructed the jury, allowing them to convict him upon a finding of implied malice, and by instructing them that he was liable for any crime that was the natural and probable consequences of the acts of his co-conspirators done in furtherance of the conspiracy.  Second Amended Petition at 19-20. Bond argues these errors resulted in the denial of due process and deprived him of his right to have the jury determine every fact necessary for his conviction.  Id.

/////

/////

**2)   State Court Opinion**

The California Court of Appeal rejected this claim stating:

> In the MacCarlie and Bond trial, the court gave the standard instructions on conspiracy, which advised the two juries that "there must exist a certain specific intent in the mind of the perpetrator.  Unless such specific intent exists, the crime to which it relates is not committed.[FN]  "The specific intent required is included in the definition of the crimes set forth elsewhere in these instructions."  The court added: "A conspiracy is an agreement entered into between two or more person with the specific intent to agree to commit the offense of murder and with the further specific intent to commit such offense followed by an overt act committed . . . for the purpose of accomplishing the object of the agreement."  Instructions were also given that a conspirator is guilty not only of the particular crime "his confederates agreed to and did commit," but also "for the natural and probable consequences of any crime or act of a coconspirator to further the object of the conspiracy . . ."
>
> > FN. Although Bond and MacCarlie were tried together, separate juries heard and decided the cases against them.
>
> > \* \* \* \*
>
> The Bond jury was told that malice may be "express or implied," but the definition of implied malice was deleted from the murder instructions.[FN]

FN. The court began to define implied malice,
but advised the jury of a "correction," and after
a bench conference only defined express
malice for the jury.

We conclude that the conspiracy instructions, read together
as they must be, properly advised the juries of the requisite
dual specific intent to agree and to commit the offense of
murder which is the object of the conspiracy.  The first
degree murder instruction additionally informed the juries of
the requirement of intent to kill.

We further conclude that references in the conspiracy
instructions to the doctrine of natural and probable
consequences to define the scope of liability did not dilute
the specific intent requirement or otherwise mislead the
juries.  "The natural and probable consequences doctrine
merely expands the *acts* for which a conspirator may be
criminally liable if the conspiracy is otherwise established: it
does not have any bearing upon the *intent* required to prove
the offense of conspiracy.  "A conspirator is criminally liable
for the acts of coconspirators which follow as a probable and
natural consequence of a common design, even where
those acts were not intended as part of the original design or
common plan."  A conspirator may be liable for an
unplanned murder that resulted as the natural and probable
consequences of a conspiracy to commit another crime.
But, a conspiracy conviction does not even require the actual
completion of the intended substantive offense.  Thus,
inclusion of the natural and probable consequences
language did not taint the conspiracy instruction to their
prejudice.

Reference to the implied malice theory of second degree
murder in the instructions, without any limitation to the
murder charges alone, violated the rule stated in <u>Swain</u> that
a conviction of conspiracy to commit murder requires a
finding of intent to kill, and cannot be based on a theory of
implied malice.  We do not find that prejudicial error was
committed, however, under the governing harmless beyond
a reasonable doubt standard for misinstruction on the
elements of an offense.

Implied malice was effectively removed as a theory from the
murder instructions given to the Bond jury.  The object of the
conspiracy–the killing of Hop–was defined only in terms of
express malice.  While the court initially told the jury that
malice may be "either express or implied," a correction was
made and the instructions were limited to intent to kill, as
<u>Swain</u> directs.  Morever, the case did not proceed against
Bond on a theory of implied malice; argument was restricted

31

1   to specific intent to kill.  Therefore, we do not perceive any
    error in the conspiracy instructions in the Bond case.

2   /////

3   Opinion at 17-20 (citations omitted).

4           **3)   Applicable Law**

5           "In a criminal trial, the State must prove every element of the offense, and

6   a jury instruction violates due process if it fails to give effect to that requirement."

7   Middleton, 541 U.S. at 437 (citing Sandstrom v. Montana, 442 U.S. 510, 520-21 (1979));

8   see also Keating v. Hood, 191 F.3d 1053, 1061 (9th Cir. 1999) (instruction that relieves

9   state of burden of proving mens rea beyond reasonable doubt contradicts presumption

10  of innocence and invades function of jury, thereby violating due process), cert. denied,

11  531 U.S. 824 (2000), abrogated on other grounds, Mancuso v. Olivarez, 292 F.3d 939,

12  944 n. 1 (9th Cir. 2002) (citation omitted).  Claims of instructional error must be

13  evaluated in the context of the instructions as a whole, not in artificial isolation.  Estelle,

14  502 U.S. at 72; United States v. Frady, 456 U.S. 152, 169 (1982) (citation omitted).

15          Errors in jury instructions involving "omissions or incorrect descriptions of

16  elements are considered trial errors" and are subject to a harmless error analysis.  Lara

17  v. Ryan, 455 F.3d 1080, 1086 (9th Cir. 2006) (citing Neder v. United States, 527 U.S. 1,

18  8-11 (1999) and California v. Roy, 519 U.S. 2, 5 (1996)); see Mitchell v. Esparza, 540

19  U.S. 12, 16 (2003) ("we have often held that the trial court's failure to instruct a jury on

20  all of the statutory elements of an offense is subject to harmless-error analysis").  The

21  United States Supreme Court has also confirmed that when a jury is instructed on

22  multiple theories of guilt, one of which is improper, harmless error analysis applies.

23  Hedgpeth v. Pulido, --- U.S. ----, 129 S.Ct. 530, 531-32 (2008).  Thus, in habeas cases

24  involving instructional error, a habeas petitioner is generally not entitled to habeas relief

25  unless such error had a "substantial and injurious effect or influence in determining the

26  jury's verdict."  See Brecht, 507 U.S. at 637-38; see also Clark v. Brown, 450 F.3d 898,

1   905 (9th Cir. 2006) ("A habeas petitioner must show that the alleged instructional error

2   'had substantial and injurious effect or influence in determining the jury's verdict.' "),

3   cert. denied, 549 U.S. 1027 (2006).

4                       **4)      Discussion**

5                With respect to Bond's argument concerning the "natural and probable

6   consequences" doctrine, the state appellate court's interpretation and analysis of that

7   doctrine, which is a state court construct, may not be challenged in this federal habeas

8   corpus action.  State courts are "the ultimate expositors of state law," and this court is

9   "bound by the state's construction except when it appears that its interpretation is an

10  obvious subterfuge to evade the consideration of a federal issue."  Peltier v. Wright, 15

11  F.3d 860, 862 (9th Cir. 1994) (quoting Mullaney v. Wilbur, 421 U.S. 684, 691 (1975)

12  (construing state court judgment)).  See also Oxborrow v. Eikenberry, 877 F.2d 1395,

13  1399 (9th Cir. 1989) (construing state statute); Melugin v. Hames, 38 F.3d 1478, 1482

14  (9th Cir. 1994) (construing state criminal statute).  There is no evidence of subterfuge

15  here.

16               However, a "claim of error based upon a right not specifically guaranteed

17  by the Constitution may nonetheless form a ground for federal habeas corpus relief

18  where its impact so infects the entire trial that the resulting conviction violates the

19  defendant's right to due process."  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981)

20  (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)).  See also Lisenba v. California,

21  314 U.S. 219, 236 (1941); Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).  In

22  order to raise such a claim in a federal habeas corpus petition, the "error alleged must

23  have resulted in a complete miscarriage of justice."  Hill v. United States, 368 U.S. 424,

24  428 (1962).

25               Bond argues that issuing instructions on the natural and probable

26  consequences doctrine "erroneously permitted the jurors to convict Bond if they found

                                              33

that Hop's death was the natural and probable consequence of acts by a conspirator in furtherance of the object of the conspiracy, even if the acts were not the object of the conspiracy." Second Amended Petition at 21. Thus, "[t]he jurors could have been convinced Bond intended the victim only be harassed or slightly harmed but the instructions erroneously permitted them to convict him of conspiracy to murder, nonetheless." Id. at 22. The actual jury instructions however belie that argument.

Bond's jury was instructed that:

> A conspiracy is an agreement entered into between two or more persons with the specific intent to agree to *commit the offense of murder* and with the further specific intent to commit such offense followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement.  Conspiracy is a crime.

RT at 5842 (emphasis added).

The jury was further instructed that:

> A member of a conspiracy *is not only guilty of* the particular crime that to his knowledge his confederates agreed to and did commit, but is also liable for the natural and probable consequences of any crime or act of a coconspirator to further the object of the conspiracy, even though such crime or act was not intended as a part of the agreed-upon objective and even though he or she was not present at the time of the commission of such criminal act.

/////

Id. at 5843 (emphasis added).

The trial judge also instructed the jury that:

> You must determine whether the defendant is guilty as a member of the conspiracy to commit *the originally agreed upon crime* or crimes, and if so, wether the crime alleged in Count 1, murder, was perpetrated by coconspirator in furtherance of such conspiracy and was a natural and probable consequence of the agreed upon criminal objective of such conspiracy.

Id. at 5843-44 (emphasis added).

/////

34

1          When read together it is clear that the instruction on the natural and

2    probable consequences doctrine did not allow the jury to convict Bond of conspiracy to

3    commit murder based on the belief that Bond "intended the victim only be harassed or

4    slightly harmed" because the jury was specifically instructed that a conspiracy was an

5    agreement to commit the offense of murder.  As the state court found, this instruction

6    merely expanded the acts for which Bond could have been criminally liable for, in

7    addition to conspiracy to commit murder, by informing the jury that a member of a

8    conspiracy is "not only" guilty of the particular crime he agreed to and did commit.  The

9    jury however did not find Bond guilty of any additional crimes aside from the conspiracy.

10   Bond has thus failed to show that the instruction on the natural and probable

11   consequences doctrine resulted in a miscarriage of justice.

12          With respect to malice, Bond's jury was orally instructed as follows:

13          Malice may be either express or implied.  Malice is express
            when there is manifested an intention unlawfully to kill a
14          human being.  Malice is implied when the natural
            consequence - - correction.  You want to approach the
15          bench?

16   RT at 5851. An off the record discussion between the trial judge and the lawyers was

17   held at the bench.[3]  After which the trial judge instructed the jury that:

18          Malice may be either express or implied.  Malice is express
            when there is manifested an intent unlawfully to kill a human
19          being.[4]

20

21          [3] It appears the trial judge momentarily mispoke, telling the jury after the next
     recess about the use of "standard instructions" and the mistakes that can sometimes
22   occur trying to edit those instructions. RT at 5854.  The judge then told the jury:
            Now as you read along, sometimes I find that we have
23          forgotten to strike a portion of the instruction that does not
            apply in this case or we have forgotten to take some
24          modifications.  So I say, "Counsel, will you approach the
            bench," and that's what we are talking about.
25   Id. at 5855.

26          [4] The jury received this same instruction in writing.  CT at 3089.

1
2
When it is shown that a killing resulted from the intentional
act - - from the intentional doing of an act with express
malice, no other mental state need be shown to establish the
mental state of malice aforethought.

3    /////

4    Id. at 5852.

5         Bond argues that this instruction implied that "implied malice does not

6    require the intent to kill" and that the "instructions did not require the jury to find intent to

7    kill in order to convict Bond of conspiracy to commit murder."  Second Amended Petition

8    at 20-21.  Again however the jury instructions do not support this argument.

9         Bond's jury was instructed that:

10
11
12
13
A conspiracy is an agreement entered into between two or
more persons with the specific intent to agree to commit the
offense of murder and with the further *specific intent to
commit such offense* followed by an overt act committed in
this state by one or more of the parties for the purpose of
accomplishing the object of the agreement.  Conspiracy is a
crime.

14
15
In order to find a defendant guilty of conspiracy, in addition
to proof of the unlawful agreement and specific intent, there
must be proof of the commission of at least one of the overt
acts alleged in the Information.

16   RT at 5842 (emphasis added).  A plain reading of the instructions shows that in order to

17   find Bond guilty of conspiracy to commit murder the jury was required to find that Bond

18   had the "specific intent to commit such offense."  Bond has therefore failed to show that

19   the trial judge's instructions had a substantial and injurious effect or influence in

20   determining the jury's verdict.

21        The state court's rejection of this claim was neither contrary to, nor an

22   unreasonable application of, clearly established constitutional law and Bond is not

23   entitled to relief on this claim.

24   /////

25   /////

26   /////

36

## C.   Insufficient Evidence

### 1)   Description of Claim

Bond argues that there was insufficient evidence that he either actually agreed to kill Hop or intended that Hop be killed.  He argues that the opinion by the California Court of Appeal acknowledged that the trial record disclosed no statement by Bond that Hop should be killed prior to the crime, but nevertheless found convincing proof of Bond's interest and participation in the murder, and in his association with the other conspirators.   Bond argues that the California Court of Appeal opinion was therefore both an unreasonable application of federal law and an unreasonable determination of the facts.

### 2)   State Court Opinion

The California Court of Appeal rejected this claim stating:

> Bond maintains that evidence of his participation in the planning of the killing of Hop is entirely absent from the record.  No evidence was adduced, Bond suggests, of any statement by him that "the victim should be killed."  Nor, he adds, do his incriminating statements "after the crime" prove his intent and agreement preexisting the murder "that the victim be killed."  He submits that he was improperly convicted on the basis of "mere association" with his codefendants.
>
> Bond focuses upon isolated facts rather than the entirety of the evidence.  The evidence, again viewed in the light most favorable to the judgment, shows that prior to the murder Bond at least expressed agreement with statements advocating the killing or beating of Hop.  Then, Bond was present and kicked Thayer during the assault upon him and the stabbing of Jones by MacCarlie, which was apparently precipitated by their disagreement with the proposal to dispatch Hop.  As soon as Hop arrived at the campground, Bond rushed to the top of the hill and hit him in the mouth.  He was then seen leaving the campground in the Ranchero with Hop and MacCarlie.  Randy, who was also in the Ranchero, testified that Bond repeatedly stabbed and hit Hop at the log landing where the murder occurred.[FN] After Hop was killed, Bond made statements that he "took care" of Hop, and knew where the body had been left.

37

FN.  We cannot discount Randy's testimony for lack of credibility, as Bond urges. " ' " ' . . . Conflicts and even testimony which is subject to justifiable suspicion, do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]' . . ." [Citation]' The testimony of a witness who was apparently belived by the trier of fact may be rejected on appeal only if that testimony was physically impossible of belief or inherently improbable without resort to inferences or deductions. "Similarly, the testimony of a witness in derogation of the judgment may not be credited on appeal simply because it contradicts the plaintiff's evidence, regardless how 'overwhelming' it is claimed to be."  We cannot reweigh the evidence, and do not consider Randy's testimony, or that any of the People's other witnesses, so inherently lacking in credibility as to be unworthy of consideration on appeal.  At most, the record reveals inconsistencies and the presentation of contrary evidence by the defense, which does not subject the testimony of prosecution witnesses to repudiation.

"While 'mere association' cannot establish a conspiracy, '[w]here there is some evidence of participation or interest in the commission of the offense, it, when taken with evidence of association, may support an inference of a conspiracy to commit the offense.'  We find in the record convincing proof of Bond's interest and participation in the murder, along with his association with the other conspirators.  Accordingly, the conviction of him for conspiracy is supported by convincing evidence.

/////

Opinion at 39-41 (citations omitted).

### 3)   Applicable Law

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).   There is sufficient evidence to support a conviction if, "after viewing

1  the evidence in the light most favorable to the prosecution, any rational trier of fact could

2  have found the essential elements of the crime beyond a reasonable doubt." Jackson v.

3  Virginia, 443 U.S. 307, 319 (1979).  See also Prantil v. State of Cal., 843 F.2d 314, 316

4  (9th Cir. 1988).  "[T]he dispositive question under Jackson is 'whether the record

5  evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"

6  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at

7  318).  "A petitioner for a federal writ of habeas corpus faces a heavy burden when

8  challenging the sufficiency of the evidence used to obtain a state conviction on federal

9  due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order

10  to grant the writ, the federal habeas court must find that the decision of the state court

11  reflected an objectively unreasonable application of Jackson and Winship to the facts of

12  the case.  Id. at 1275 & n.13.

13        The court must review the entire record when the sufficiency of the

14  evidence is challenged in habeas proceedings.  Adamson v. Ricketts, 758 F.2d 441,

15  448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en

16  banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the

17  testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to

18  ultimate facts." Jackson, 443 U.S. at 319.  If the trier of fact could draw conflicting

19  inferences from the evidence, the court in its review will assign the inference that favors

20  conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The relevant inquiry

21  is not whether the evidence excludes every hypothesis except guilt, but whether the jury

22  could reasonably arrive at its verdict.  United States v. Mares, 940 F.2d 455, 458 (9th

23  Cir. 1991).  Thus, "[t]he question is not whether we are personally convinced beyond a

24  reasonable doubt" but rather "whether rational jurors could reach the conclusion that

25  these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal

26  habeas court determines sufficiency of the evidence in reference to the substantive

39

1   elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324

2   n.16; Chein, 373 F.3d at 983.

3          **4)    Discussion**

4          California law defines a criminal conspiracy as involving "two or more

5   persons" that conspire "[t]o commit any crime." CAL. PEN. CODE § 182(a)(1). "A

6   conviction of conspiracy requires proof that the defendant and another person had the

7   specific intent to agree or conspire to commit an offense, as well as the specific intent to

8   commit the elements of that offense, together with proof of the commission of an overt

9   act by one or more of the parties to such agreement in furtherance of the conspiracy."

10  People v. Jurado, 38 Cal.4th 72, 41 (Cal. 2006) (internal quotation marks omitted).

11  Additionally, "[d]isagreement as to who the coconspirators were or who did an overt act,

12  or exactly what that act was, does not invalidate a conspiracy conviction, as long as a

13  unanimous jury is convinced beyond a reasonable doubt that a conspirator did commit

14  some overt act in furtherance of the conspiracy." Id. at 120-21 (internal quotation marks

15  omitted).  The commitment offense at issue here is conspiracy to commit first degree

16  murder, which under California law, is the unlawful, unjustified killing of another with

17  malice aforethought. CAL. PEN. CODE § 187.

18         Bond's jury heard testimony that Frazier said, "[t]hat mother fucker should

19  be killed," in reference to Hop, and that Bond was "more or less agreeing," and said

20  "[s]omething like something ought to be done." RT at 3062-64.  The jury heard that

21  Bond, MacCarlie and Adcock talked about, "[d]oing him, doing him tonight, take care of

22  that sucker" in reference to Hop. Id. at 2834.  The jury heard that at the top of the hill

23  Bond punched Hop. Id. 2068.  The jury heard that while Bond was present, Hop said,

24  "[h]ey, man, I didn't do it, you know.  You know, what are you going to do?  Kill me and

25  throw me in the bushes," and that MacCarlie responded, "[s]omething like that, yeah."

26  Id. at 2525, 2527.

The jury heard that shortly thereafter Bond drove the Ranchero out of the Campground with MacCarlie in the passenger seat and Hop seated between them. Id. at 2535. Finally, the jury heard testimony that after Hop's murder, Bond stated, "[w]ell, we don't have to worry about it now. We took care of it. We took care of that child molester." Id. at 3849. Presented with this evidence rational jurors could reach the conclusion that these jurors reached, specifically that Bond was guilty of conspiring to murder Hop Summar.

The state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established constitutional law and Bond is not entitled to relief on this claim.

### D.   Accumulation of Error

#### 1)   Description of Claim

Bond argues that the individual errors raised in his petition also constituted cumulative error, which rendered his conviction for conspiracy to commit first degree murder fundamentally unfair and a denial of federal due process. Second Amended Petition at 24-27.

#### 2)   Applicabile Law And Discussion

In cases where there are a number of trial errors, the court may look at "the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988)). "In other words, 'errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.' " Alcala v. Woodford, 334 F.3d 862, 883 (9th Cir. 2003) (quoting Thomas v. Hubbard, 273 F.3d 1164, 1180 (9th Cir. 2001)).

/////

However, "where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation." <u>Fuller v. Roe</u>, 182 F.3d 699, 704 (9th Cir. 1999), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000). Here, there was no single error committed and therefore there was no cumulative error. Bond thus is not entitled to relief on this claim.

## VI.   **CONCLUSION**

Accordingly, IT IS RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991). In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. <u>See</u> Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: May 20, 2010

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

42